**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Criminal Action |
| MARIO RILEY, | ) | No. 10-05003-01-CR-SW-RED |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

Defendant filed a Motion to Suppress Evidence, [Doc. # 30], to which the government responded. [Doc. # 35]. Defendant then filed a Reply to Government's Suggestions in Opposition to Motion to Suppress. [Doc. # 37]. The matters were set for an evidentiary hearing, which was held before the undersigned on December 20, 2010. The defendant was present with counsel, Brian D. Risley, and the United States was represented by Tim Garrison, Assistant United States Attorney. After the hearing, defendant filed Suggestions in Support of Motion to Suppress Following Hearing and Evidence Presented by the Government. [Doc. # 40].

The government first called Trooper K. J. Rutledge with the Missouri State Highway Patrol. On October 17, 2009, he was on duty on Interstate 44. The Highway Patrol was having a special operation going on that day, which was described by the officer as a "hazardous moving violation enforcement project. . . ." [Tr. 3]. Trooper Rutledge stated that the Highway Patrol stopped a large number of motorists for minor traffic violations that day, and that there is "always an emphasis on the number of motorists that we contact, and so we stop many, many cars for minor traffic

violations. Not necessarily to issue citations, but a warning or whatever is appropriate, and to generate–we try to be very productive during those enforcement projects." [Id.]. As he was on patrol, Trooper Rutledge observed defendant's vehicle weave across the center line twice. He also identified the vehicle as a rental car. He then initiated a traffic stop. He walked up to the driver's side of the vehicle, and spoke to the driver. Trooper Rutledge asked him for his driver's license and rental car agreement, and then asked him to come back to his vehicle after the driver produced those documents, while he ran a records' check. The officer testified that he frequently asks an individual he stops to accompany him to his vehicle, because this gives him an opportunity to observe and keep an eye on him or her. He thinks it also lessens anxiety if the person sits in the patrol car with him. While they were sitting in the vehicle together, he called in the driver's license and vehicle registration information, and talked to defendant while he was waiting for that to come back. The car had been rented for a seven-day rental. He also checked for arrest warrants, of which there were none. Trooper Rutledge asked defendant some questions, such as if he had been traveling long and where he had been. Defendant said he'd been to a casino in Tulsa overnight. The officer stated that defendant seemed "incredibly nervous," which he had noticed initially when he spoke to him. [Tr. 6]. He was stumbling over his words. The officer was asking him about his trip to the casino, and defendant did not recall routine details. Defendant's heart rate was elevated, which the officer could physically observe in his neck and his stomach, and his breathing was shallow. Defendant was continually wiping his face and scratching his head. Trooper Rutledge testified that defendant was much more nervous than the innocent motorist during a routine traffic stop. He noticed that being in the car with him intensified defendant's anxiety. The officer determined that defendant lived in Alton, Illinois, and that he had gone to the Hard Rock Casino in Tulsa for one night. The officer

thought this was curious because he went by himself and bypassed closer casinos. He asked defendant about the Hard Rock Casino, because he had never been there. When he asked him what floor he stayed on, defendant said he didn't actually stay there, and he couldn't remember the name of the hotel where he did stay. Trooper Rutledge became suspicious because defendant's story kept changing, and at that point he asked him about his criminal history. Defendant said that he had one previous arrest for domestic battery in 1995. The records' check indicated, however, that defendant had a criminal history for several drug violations, and several felony arrests including arrests for assaulting law enforcement. Trooper Rutledge called for a back-up officer at this point. He then asked defendant for consent to search his vehicle, which he refused. At that point, Trooper Rutledge called for the assistance of a K-9 officer. He attempted to contact a K-9 officer through dispatch, and was told that nobody was on duty. The Highway Patrol just has two officers for the Troop D area, who also have to cover other additional counties. He then called Corporal Tom Hall, a K-9 officer, at his home. He said he could come to Trooper Rutledge's assistance. According to the radio log, he had stopped defendant's vehicle at approximately 3:15 p.m. At 3:26, he noted that the K-9 officer was en route, and Corporal Hall arrived at 4:09. While he and defendant were waiting, defendant acknowledged that he had not been in Tulsa, but had been in Houston, Texas, visiting his sister. He could not, however, provide an address or description of her house. After Corporal Hall arrived, he got his dog, Evan, out of his vehicle. The dog immediately alerted on the trunk area by scratching at the trunk area; Corporal Hall pulled him back for a second, and Evan then alerted on the trunk of defendant's car for the second time. Because this was a positive indication for narcotics, the officers then conducted a search of the trunk of the car where the dog had alerted. At that time, he did not search the passenger area of the car. Defendant was not under arrest at the time of the

search.

During Trooper Rutledge's testimony, he stated that his vehicle was equipped with a camera, and he had audio and visual footage of the stop. Portions of the tape were then played in open court. During the conversation in the vehicle, defendant stated that he only had one past arrest for domestic battery. He gave evasive answers about his trip to Tulsa. He expressed confusion about why he was stopped and why he had to sit in the vehicle with the officer. The officer told him he didn't think he was telling the truth, and that he thought he was terribly nervous. The officer asked him if he had anything illegal in his car, and asked him if he could search it. He said he thought defendant had drugs in his car. Defendant did not consent to the search. The officer told him what he was going to do regarding getting a drug dog and searching the car. He told him if he would let him search and cooperate, it would help him out. Defendant wanted to know if he was under arrest, and he said that if he wasn't, he wasn't going to let the officer search. Trooper Rutledge asked defendant if he had anything in his pockets, and he had him empty his pockets. The officer then searched the contents of his pockets.

On cross examination, Trooper Rutledge was asked if his camera was on when he first observed defendant's vehicle, and he testified that it was not. The traffic violations were therefore not captured on video. He agreed that the amount of time that elapsed was depicted on the video in terms of the time it took to exit his vehicle, approach defendant's vehicle, talk to him, and ask him to come back to the patrol car. When he spoke to defendant while he was still in his vehicle and asked him for his driver's license and the rental agreement, he noticed that defendant appeared nervous and his hands were shaking. The officer agreed that he did not specifically ask defendant if he had ever been arrested, but rather, asked him if he had been in trouble before. Defendant said

that he had a domestic assault arrest. The officer was concerned that defendant did not tell him about the felony drug violations and assault on a police officer. Trooper Rutledge testified that he thought defendant knew exactly what he was asking, given that he told him about one arrest. The officer testified that he immediately called for backup after learning that defendant had previous arrests for assaulting law enforcement, and Corporal Darren Call of the Highway Patrol came to the scene. He made the decision to call for the drug dog because defendant was exceptionally nervous, his story was not consistent, and he didn't disclose all his arrests. He also called for the K-9 unit based on his training and experience, and the totality of the circumstances, which he believed gave him reasonable suspicion that defendant was involved with some type of criminal activity. Defendant was not under arrest, but he was not free to leave. Trooper Rutledge testified that he was not familiar with canine units in Lawrence County, and he did not know if one was available, so he bypassed Lawrence County, and called the ranking K-9 officer, who instructed him to call Corporal Hall. He estimated that he would be there in about 45 minutes, and the radio log indicated that it took him 43 minutes to arrive on the scene. When the drug dog alerted, they searched the trunk of the vehicle. After finding cocaine in the trunk, he believed they searched the rest of the vehicle.

The next witness called by the government was Corporal Tom Hall, who is employed with the Missouri State Highway Patrol. He explained his training and certification with his K-9 unit, and explained what the dog is trained to do. He is assigned to Troop D, which covers 18 counties, and he helps out in other counties as well. He has worked with Evan since 2005, and was recertified in 2009. He was called by Trooper Rutledge to come to Lawrence County. He lived in Christian County and was off duty at the time. It look him approximately 40 minutes to arrive. When they

got there, he talked to Officer Rutledge, and then deployed his dog, by letting him sniff around the vehicle, proceeding in a clockwise direction. When Evan got to the trunk, he sniffed and scratched. He moved him away, and then he went back to the trunk area where he alerted again. They searched the trunk, and found about a kilogram of cocaine. The video shown in court of the canine search in open court verified the officer's testimony that the dog alerted to the trunk twice.

On cross examination, the officer testified that he was contacted by telephone by Trooper Rutledge. When they got there, he did not recall what the officers discussed. After the dog had scratched on the trunk twice, he told Trooper Rutledge that this had occurred, to convey that there was probable cause to search the trunk.

It is defendant's position that the detention, search and seizure, and arrest were unlawful and in violation of his Fourth Amendment rights. He asserts that there was not objectively reasonable articulable suspicion of criminal activity to detain him nor probable cause to search or arrest him. Defendant submits that all evidence seized and all statements made should be suppressed. He contends that his arrest and detention went beyond the permissible bounds of the Fourth Amendment and the standard set forth in Terry v. Ohio, 392 U.S. 1 (1968). He also contends that the stop was pretextual and not based upon probable cause because there is no indication that Trooper Rutledge investigated the alleged weaving and the video of the incident provides no evidence that weaving occurred. Defendant contends that any search exceeded the scope of the investigation, and violated Arizona v. Gant, 129 S.Ct. 1710 (2009), and Chimel v. California, 395 U.S. 752 (1969). It is his contention that he was under custodial arrest and was not free to leave; therefore, he asserts that the search of his vehicle was illegal and the evidence seized should be suppressed. He also contends that Trooper Rutledge did not have probable cause to request a drug-sniffing dog, and that the amount of time defendant was delayed was unreasonable and in violation of his Fourth Amendment

rights. Defendant asserts, additionally, that no exigent circumstances existed for a warrantless search of his vehicle.

The government contends that defendant's vehicle was lawfully stopped for a traffic violation. It is also the government's position that during the course of his investigation of the traffic violation, Trooper Rutledge developed reasonable suspicion of additional criminal activity, justifying an extension of the detention and expansion of the investigation, in reliance on United States v. Gill, 513 F.3d 836, 844 (8th Cir. 2008), and United States v. Rivera, 570 F.3d 1009, 1013 (8th Cir. 2009). The government submits that the search in this case was not a search incident to arrest, and therefore, that Gant and Chimel are inapposite. It is argued that the search of defendant's car was lawfully conducted under the automobile exception to the Fourth Amendment. In response to defendant's argument that the officer lacked probable cause to request a drug-sniffing dog, and that the delay in obtaining the dog was unreasonable, the government contends that the delay was not unreasonable under the circumstances, and that no Fourth Amendment violation occurred because the drug dog alerted on the exterior of the vehicle. Once the trained and certified drug dog alerted on the vehicle, it is argued that the officers had probable cause to conduct a search of defendant's vehicle without a warrant under the automobile exception to the Fourth Amendment. United States v. Ross, 456 U.S. 798, 804-09 (1982).

In his reply to the government's suggestions in opposition, defendant contends that his case is distinguishable from Gill. He also asserts that he did not consent to a search and did not provide Trooper Rutledge with any inconsistent statements until after a drug dog had been requested and he was no longer free to leave. It is his position that any statements he made should not be admitted or used against him because he was not advised of his Miranda rights and he was not free to leave.

Defendant filed further suggestions in support of the motion to suppress after the hearing.

He contends that based on the testimony adduced at the hearing from Trooper Rutledge, as well as the video, the officer would only have had a 30-40 second window to observe defendant's alleged extreme nervousness. It is his position that the nervousness and what the officer perceived as inaccurate information provided by defendant is not sufficient to rise to the level of reasonable suspicion. He asserts, additionally, that Trooper Rutledge was engaging in a "blended process" of a routine traffic stop and a drug interdiction investigation, and that the duration of the officer's focus on non-routine questions prolonged the stop beyond a reasonable time. Defendant also contends that the officer bypassed the Lawrence County Sheriff's Office by calling Trooper Hall directly, and that this unreasonably prolonged the stop.

After having fully reviewed the record, and based on the totality of the circumstances, the Court finds, initially, that the evidence adduced at the hearing establishes that the traffic stop was valid under Missouri law. Mo. Rev. Stat. § 304.015.5(1). The officer testified about the fact that the Highway Patrol was having a special operation going on that day, in which a large number of motorists were stopped for minor traffic violations. As he was on patrol, Trooper Rutledge observed defendant's vehicle weave across the center line twice, which was a violation of §304.015.5(1). Therefore, it is clear that the traffic stop was valid.

After the valid stop, the officer engaged defendant in routine conversation, during which time he observed what he perceived to be suspicious behavior on defendant's part. The officer credibly testified that, based on his experience, defendant was unusually nervous under the circumstances. Defendant argues that the officer did not have time from the moment of approaching the vehicle to when the video started running to actually observe nervousness to the extent to which he testified. The Court finds, however, that the officer's credible testimony was that he observed defendant's hands shaking and that he appeared nervous when he handed over his driver's license and rental

agreement. Trooper Rutledge also credibly testified that defendant became increasingly nervous in the patrol vehicle, which could be partially observed in the video. The officer testified that usually being in the patrol car puts an individual at ease. Based on his experience, which was considerable, defendant was suspiciously nervous. The Court has no reason to discount Trooper Rutledge's testimony, particularly when coupled with the fact that defendant also gave evasive answers regarding being at a casino in Tulsa, and incorrect information about his criminal history. It is clear that under Terry, the officer could legally engage defendant in conversation about the origin and destination of his trip. He could also ask him about his criminal history without unconstitutionally extending the seizure. Whether he asked the question in the form of inquiring if defendant had ever been in trouble or asked specifically if he had ever been arrested, it is apparent that defendant understood the nature of the question. Defendant had had prior experience with law enforcement, and did not appear confused about what the officer was asking him. Having fully reviewed the video, it was quite obvious that defendant stated more than once that an arrest for domestic battery or violence was the extent of his criminal history, which a records' check proved to be untrue. He was also evasive about the nature of his trip, and was clearly caught in lies about being at the casino in Tulsa. Once the officer learned of defendant's criminal history, he called for back-up for officer safety. Based on his extreme nervousness, defendant's lack of honesty, and his criminal history, which included several drug violations, Trooper Rutledge made the decision to call for a K-9 unit. The Court finds that, given the record as a whole, there is evidence to support a finding that Trooper Rutledge had reasonable suspicion of criminal activity sufficient to justify broadening his inquiry and to expand the scope of the traffic stop. Gill, 513 F.3d at 844-45. Therefore, defendant's constitutional rights were not violated in this regard.

The law is clear that the use of a properly trained and reliable drug dog to sniff the exterior

of a vehicle is not an illegal search under the Fourth Amendment if the traffic stop is "lawful at its inception and otherwise executed in a reasonable manner." United States v. Olivera-Mendez, 484 F.3d 505, 512 (8th Cir. 2007), quoting Illinois v. Caballes, 543 U.S. 405, 407, 408 (2005). If, however, the stop is unreasonably prolonged before the dog is employed, such a dog sniff may be the product of an unconstitutional seizure. Olivera-Mendez, 484 F.3d at 511. A properly trained drug dog's alerting provides probable cause for the arrest and search of a person or for the search of a vehicle. Id. at 512; United States v. Hogan, 539 F.3d 916, 921 (8th Cir. 2008). A drug detection dog is considered reliable when it has been "trained and certified to detect drugs." Olivera-Mendez, 484 F.3d at 512 (quotation omitted).

Defendant has not challenged the training or reliability of the drug dog used in this case. Rather, defendant asserts that Trooper Rutledge unreasonably delayed the stop and detention by calling Trooper Hall. Having fully reviewed the record and applicable case law, there is nothing before the Court to suggest that Trooper Rutledge acted improperly in calling Trooper Hall directly or that there was such a delay in his arrival that defendant's Fourth Amendment rights were violated. It is clear that the proper inquiry does not require counting the minutes that it takes a K-9 unit to arrive, but rather, it is to ask whether law enforcement acted diligently to verify their suspicions as quickly as possible. United States v. Bloomfield, 40 F.3d 910, 917 (8th Cir. 1994). As noted by the Bloomfield court, when law enforcement officers have reasonable suspicion that the assistance of a drug dog in a Terry roadside stop might be needed, "it will in general take time to obtain one; local government police forces and the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times." Id. at 917. In this case, Trooper Rutledge testified that calling Trooper Hall, who was also with the Highway Patrol, would ensure

that he would have a well-qualified K-9 unit on the scene as soon as possible. It is clear from the testimony of both officers that K-9 units are not plentiful in the area in question, which includes rural counties, and that, from whatever source, there would be some delay before a drug dog would arrive. According to the record, the time that elapsed from the initial stop to the drug dog arriving on the scene was 43 minutes. Under the totality of the circumstances, which included obtaining an officer who was not on duty at the time, and who had to travel from one county to another, the Court finds that this was not an unreasonable amount of time to wait for a drug dog to verify Trooper Rutledge's suspicions. Id. (holding that a one-hour delay was not an unreasonable amount of time). Additionally, having viewed the video, it is apparent that the drug-sniffing process began soon after Trooper Hall arrived on the scene, and that the drug dog, Evan, promptly alerted on the trunk of defendant's vehicle. The Court agrees with the government, moreover, that Gant and Chimel are inapposite to this case, as the search was not incident to an arrest. Rather, once the drug dog alerted on defendant's vehicle, the law is clear that the officers had probable cause to conduct a search of that vehicle without a warrant under the automobile exception to the Fourth Amendment. Ross, 456 U.S. at 804-09.

Defendant also raised an issue that he was not advised of his Miranda rights and he was not free to leave. Because defendant was not in custody and the questions asked did not exceed the scope of a Terry stop,

there was no constitutional violation in not reading defendant his Miranda rights.

Based on the foregoing, the Court finds that it must be recommended that defendant's Motion to Suppress be denied.

Therefore, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the

United States District Court for the Western District of Missouri,

RECOMMENDED that defendant's Motion to Suppress Evidence be denied.

/s/ James C. England
JAMES C. ENGLAND
United States Magistrate Judge

Date: 2/4/11